# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RAYMOND SAMUEL DAVENPORT, III** | : | **CIVIL ACTION** |
| | : | |
| | : | |
| **v.** | : | **NO. 17-1616** |
| | : | |
| **POTTSTOWN HOSPITAL COMPANY LLC**, *et al.* | : | |
| | : | |

## MEMORANDUM

**KEARNEY, J.**                                                   **October 6, 2017**

Raymond Davenport is now on his third *pro se* attempt to plead civil rights liability under the First and Second Amendment and federal and state laws against a hospital, police department and their identified agents arising from his commitment to the hospital on Shabbat due to the police's concerns regarding his mental condition. After three attempts, he still has not plead facts giving rise to civil rights liability under the First and Second Amendment or otherwise under federal law, with the exception of a Fourth Amendment claim against a police officer. His third attempt will proceed on two claims subject to review following discovery: a civil rights claim under the Fourth Amendment against one of the police officers and an intentional infliction of emotional distress claim against the hospital and its agents and the police officers. In the accompanying Orders, we grant the motions to dismiss the remaining claims and dismiss the police department.

## I.    Allegations

Raymond Davenport, a devout Jewish person, experienced "disorientation of thoughts and confusion" on April 3, 2015.[1] He continued to work and practice his Jewish religion.[2] Over the next six days, Mr. Davenport became "increasingly sensitive to humanitarian issues in the

world and maintained a positive and peaceful demeanor."[3]  On April 9, 2015, Mr. Davenport's physician deemed him "not a harm to himself or others."[4]

On April 10, 2015, Mr. Davenport drove to the grocery store to purchase food for Shabbat.[5]  While grocery shopping, Mr. Davenport became "increasingly confused and did not properly use the self-checkout machine in the store."[6]  Mr. Davenport then left the grocery store but could not locate his car in the parking lot.[7]  A store employee approached Mr. Davenport in the parking lot and asked him to return to the grocery store.[8]

The grocery store called North Coventry Township Police regarding possible theft because of Mr. Davenport's "incorrect checkout procedure and subsequent walk out to the parking lot."[9]  Mr. Davenport attempted to pay for the groceries "to make it right."[10]  Police Officer Victoria Hipple and Detective Timothy Prouty found Mr. Davenport to be severely confused but decided he did not intend to commit theft based on his confusion and subsequent cooperation.[11]  The grocery store declined to pursue theft charges against Mr. Davenport due to his confusion.[12]

For an unknown reason, at approximately 12:30 P.M., the Police placed Mr. Davenport into custody.[13]  They handcuffed Mr. Davenport and then searched him.[14]  The officers then drove him to the police station and kept him handcuffed in the holding area.[15]  The Police requested Ebony Willis from Valley Creek Crisis evaluate Mr. Davenport's mental state.[16]  She evaluated him while he remained handcuffed in the Police's holding area.[17]

After Ms. Willis evaluated him, the Police told Mr. Davenport to sign a "201 for voluntary treatment or be faced with criminal charges and incarceration."[18]  They also told Mr. Davenport "life would be more difficult" if he refused to sign the "201."[19]  Mr. Davenport signed the "201."[20]

Officer Hipple then drove Mr. Davenport to Pottstown Memorial Hospital for drug and alcohol screening and medical clearance.[21]  Officer Hipple gave Mr. Davenport's signed 201 paperwork to a Hospital crisis worker named Lauren.[22]  Mr. Davenport does not know what other instructions or information Officer Hipple provided Lauren and the Hospital.[23]  Lauren communicated with the Police and Ms. Willis during Mr. Davenport's time at the Hospital.[24]

Mr. Davenport then "signed himself in to [the Hospital] with disoriented thoughts, confusion, and reduced physical awareness under threats of incarceration and criminal prosecution if he did not sign himself in at" the Hospital.[25]  When the Hospital admitted Mr. Davenport, it assessed him as "confused and disoriented, but not a harm to himself or others."[26]

During his evaluation, Mr. Davenport explained he kept kosher for Passover and required kosher food.[27]  The Hospital noted his mention of religious dietary restrictions but interpreted Mr. Davenport to be on a "fasting strike" and described his mention of Passover as "rambl[ing] a little bit about Passover."[28]  Mr. Davenport alleges Hospital employee Registered Nurse Nancy Coyne is responsible for the medical records describing Mr. Davenport's supposed fasting strike.[29]

When admitting Mr. Davenport, the Hospital erroneously combined his medical records with another patient's medical records and included the other patient's history of self-mutilation, suicide attempts, and suicidal statements.[30]  The Hospital staff placed Mr. Davenport in a room without furniture and left him without supervision for over an hour in the emergency room area.[31]  During this hour or so, Mr. Davenport grew even more confused and disoriented and his condition deteriorated from the sight and sounds of others' trauma.[32]

Sometime later, while still admitted at the Hospital, Mr. Davenport "fell to the floor and became unresponsive and unconscious for an extended period of time."[33]  The Hospital staff

attempted to revive Mr. Davenport by "scraping the sternum and trapezius muscle pinching which caused intense pain" and long-scarring to his sternum.[34] Mr. Davenport alleges Doctor Pamela Franz and Registered Nurse Rita Andrew treated him while admitted to the Hospital and their lack of supervision caused his fall.[35] Mr. Davenport's fall caused his "condition immediately and significantly worsened" changing his mental state and behavior.[36] Because of his fall, Mr. Davenport also needed extended treatment at other facilities and suffered "extreme long-term pain and suffering."[37]

At some point during Mr. Davenport's April 10th day, Hospital employee Jose Ortiz contacted the North Coventry Police because Ms. Willis, the crisis center worker, signed the paperwork in the incorrect place.[38] Mr. Ortiz spoke with Police Officer Jesse Smith who is a K-9 Drug Specialist.[39] Officer Smith allegedly told Mr. Ortiz if Mr. Davenport refused to sign another 201 then Officer Smith "would incarcerate [Mr. Davenport] and complete a criminal complaint."[40] "The police report states [the Hospital] attempted to get new 201 forms signed" from Mr. Davenport for the Police.[41]

Officer Smith arrived at the Hospital at approximately 11:00 p.m. on April 10th to evaluate Mr. Davenport and "determine if behavior of [Mr. Davenport] had changed from earlier in the day" and work with Mr. Ortiz to force Mr. Davenport to sign a new 201 form.[42] Mr. Davenport alleges the Hospital pressured him to sign the paperwork on Shabbat in disregard, intolerance and deprivation of his First Amendment freedom of religion rights.[43] Upon arriving at the Hospital, Officer Smith described himself as "frustrated" stating Mr. Davenport "is on drugs" and "should be locked up."[44] Officer Smith also stated Mr. Davenport "'was full of drugs' or 'definitely on drugs.'"[45] Mr. Davenport had no drugs or alcohol in his system according to the Hospital's lab blood tests.[46]

Officer Smith then went to Mr. Davenport's hospital room while Mr. Davenport was in a period of "forced and short moment of consciousness."[47] Mr. Davenport expressed being in pain and disoriented and asked someone to close the door to his room to reduce the stressful environment.[48] No one would shut the door so Mr. Davenport got out of bed and attempted to shut the door.[49] When he began walking, Officer Smith grabbed Mr. Davenport "by the arm then proceeded to do a 'left arm bar' driving [him] into the wall and handcuffed [him] behind his back."[50] Officer Smith also grabbed Mr. Davenport by the throat area when pinning him against the wall and asked "2 questions regarding harm to self or others" and Mr. Davenport responded "no" to both questions.[51] Officer Smith then rephrased his first question to ask if Mr. Davenport was suicidal "at which point Office[r] Smith claims [Mr. Davenport] responded 'yes.' "[52] Mr. Davenport pleads the "alleged 'yes' is in response to the significant trauma, stress, assault, and battery experienced over the past few hours."[53] Officer Smith then called Hospital security and together they applied additional restraints to Mr. Davenport to secure him in the bed.[54]

Officer Smith used Mr. Davenport's "yes" to the suicide question to complete a 302 involuntary commitment form.[55] The 302 involuntary commitment form overrode Mr. Davenport's 201 voluntary commitment paperwork.[56] Mr. Ortiz stated he would complete the contact work for Mr. Davenport's 302 involuntary commitment and "further processing to have the 302 petition by Officer Smith approved."[57]

Feeling under "significant scrutiny" and not wanting to support the fasting strike claim, Mr. Davenport ate the oatmeal, not Kosher for Passover, the Hospital served to him on April 11th.[58]

Mr. Davenport alleges Officer Smith, Detective Prouty, and Hospital employee Ortiz conspired to deprive him of his right to keep and bear arms.[59] At some point during his ordeal,

Detective Prouty told Mr. Davenport he would not lose civil rights and there would be no record of his treatment.[60]  Detective Prouty's false information led Mr. Davenport to make "appeals and other actions not [to] be pursued to defend civil rights including the Second Amendment."[61]  Officer Smith then assaulted and traumatized Mr. Davenport "to manipulate and claim the need for an involuntary commitment" while Hospital employee Ortiz worked with him and secured approval for the 302 involuntary commitment form.[62]  Mr. Davenport does not allege anyone deprived him of a firearm.

## II.    Analysis

Mr. Davenport *pro se* sued North Coventry Township Police Department alleging § 1983 civil rights liability for violating his First Amendment rights, *Monell* municipal liability based on failure to train/supervise, violations of 42 U.S.C. § 2000bb and 71 Pa. Stat. Ann. § 2403, and intentional infliction of emotional distress.   He also sued police officer Jesse Smith alleging § 1983 civil rights liability for violating his First, Second, and Fourth Amendment rights and state law claims for malicious prosecution and intentional infliction of emotional distress.   Mr. Davenport also alleges police officer Victoria Hipple violated his First Amendment rights and Detective Timothy Prouty violated his Second Amendment rights and asserts intentional infliction of emotional distress against both.

Mr. Davenport also sued three Hospital employees: Dr. Franz, Nurse Andrews, and Mr. Ortiz.  Against Dr. Franz, Mr. Davenport alleges § 1983 civil rights liability and state law claims for medical negligence and intentional infliction of emotional distress.  Mr. Davenport alleges state law claims of medical negligence and intentional infliction of emotional distress against Nurse Andrews.  He alleges § 1983 civil rights liability against Mr. Ortiz for violating his First

and Second Amendment rights and a state law claim for intentional infliction of emotional distress.

The various Defendants move to dismiss some or all of the claims against them.[63] While *pro se* pleadings "must be held to less stringent standards than formal pleadings drafted by lawyers," they must "still allege sufficient facts in their complaints to support a claim."[64]

## A. We dismiss Mr. Davenport's § 1983 claims.

To successfully plead a "basic cause of action" for a § 1983 claim, Mr. Davenport must allege facts showing "(1) … the conduct complained of was committed by a person acting under color of state law; and (2) … the conduct deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States."[65]

### 1. Mr. Davenport fails to plead First and Second Amendment claims against North Coventry Township and its officers.

Mr. Davenport claims North Coventry Township, Officer Hipple, Officer Smith, and Detective Prouty violated § 1983 by infringing upon his First and Second Amendment rights. The North Coventry Township Police Department, Officer Smith, Officer Hipple, and Detective Prouty move to dismiss Mr. Davenport's claims against them with the exception of Mr. Davenport's Fourth Amendment claim against Officer Smith.

#### i. Mr. Davenport fails to plead a First Amendment claim against the Police Department or its Officers.

Mr. Davenport alleges the Police Department, Officer Smith, and Officer Hipple deprived him of his civil rights under the First Amendment by transporting him in a vehicle on Shabbat, failing to serve Kosher on Shabbat during Passover despite his request, and forcing him to sign documents during Shabbat.

Only the actor who "played an 'affirmative part' in the alleged misconduct, either through personal direction of or actual knowledge and acquiescence in the deprivation" commits the violation under § 1983.[66] We cannot find liability against an entity, deemed acting under the color of state law, "premised on a theory of respondeat superior."[67] Mr. Davenport cannot state a § 1983 violation of his First Amendment rights against the Police Department because it is not the actor allegedly violating Mr. Davenport's rights; its employees are the alleged actors. We dismiss the § 1983 First Amendment claims against the Police Department because Mr. Davenport must allege claims against the Police Department through *Monell* municipal liability.

As to the individual officers, Mr. Davenport alleges Officer Hipple took him into custody at the grocery store and brought him to the Police station. Officer Hipple then sometime later drove him to the Hospital and provided crisis worker "Lauren" with his 201 paperwork. Mr. Davenport alleges forcing him to eat non-Kosher food, signing documents, and being transported by vehicle after Shabbat began violates the First Amendment. Even assuming these are First Amendment violations, Mr. Davenport does not allege how Officer Hipple is involved with the non-Kosher food served or the transport to a different facility. Instead, as Mr. Davenport admits, Officer Hipple placed Mr. Davenport into custody and transported him to the Hospital before Shabbat began based on his allegation he "voluntarily admitted himself [to the Hospital] before Shabbat."[68] As Mr. Davenport fails to plead facts describing how Officer Hipple violated his First Amendment rights, we dismiss this claim against her.

Mr. Davenport alleges Officer Smith violated his First Amendment right to free exercise by attempting to coerce him to sign the commitment document during Shabbat. Mr. Davenport's free exercise claims against Officer Smith are barred by qualified immunity. The doctrine of qualified immunity protects government officials from liability for civil damages so long as their

conduct does not violate clearly established statutory or constitutional rights known to a reasonable person.[69]   For a right to be "clearly established," the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."[70]   The court must determine whether a reasonable official "could have believed" their actions were lawful at the time of the alleged violation.[71]   Qualified immunity is appropriate unless the unlawfulness of the act is apparent.[72]   We resolve questions of qualified immunity at the "earliest possible stage in litigation."[73]

In *Saucier v. Katz*, the Supreme Court defined the two-part framework for analyzing qualified immunity defenses.   First, plaintiff must plead facts demonstrating "the violation of a constitutional right."[74]   If the plaintiff successfully pleads such a violation, we then determine whether the "right at issue was clearly established at the time of the defendant's alleged misconduct."[75]   We are not bound by this rigid temporal sequence.[76]   We may address either prong based on the circumstances of the particular case.[77]

We elect to address the second prong of the *Saucier* analysis.   To succeed on a § 1983 First Amendment free exercise claim, Mr. Davenport must plead Officer Smith violated a "clearly established statutory or constitutional right."[78]   Mr. Davenport pleads Officer Smith attempted to coerce him to sign commitment paperwork on Shabbat.[79]   Mr. Davenport alleges his Jewish faith forbids him from signing documents on Shabbat.[80]   Mr. Davenport alleges Officer Smith threatened him with incarceration and criminal charges if he did not sign the documents.[81] A thorough review of the case law reveals no clearly established right to abstain from signing paperwork on Shabbat. Regardless, Mr. Davenport fails to allege such a clearly established right. Mr. Davenport also fails to allege facts showing Officer Smith knew of such a right and consciously violated it.   Mr. Davenport pleads no facts demonstrating the apparent illegality of

Officer Smith's actions or why Officer Smith could not reasonably believe his actions were lawful. Because we find no clearly established right, we do not address whether Officer Smith actually violated Mr. Davenport's First Amendment free exercise rights under *Saucier*. We grant Officer Smith's motion to dismiss Mr. Davenport's § 1983 First Amendment free exercise claim.

### ii. Mr. Davenport fails to plead Second Amendment claims against Officer Smith or Detective Prouty.

Mr. Davenport alleges Officer Smith and Detective Prouty violated his Second Amendment rights by placing him in commitment based on false statements and physical assault. Mr. Davenport argues his involuntary commitment now prohibits him from owning a firearm. He never pleads possessing a firearm. Officer Smith and Detective Prouty argue they did not deprive Mr. Davenport of his Second Amendment rights.

To plead this Second Amendment claim, Mr. Davenport must allege the officers deprived him of the right to possess a firearm. Mr. Davenport alleges Detective Prouty falsely told him "there would be no loss of civil rights and no record after treatment which would affect [Mr. Davenport's] rights."[82] Mr. Davenport alleges Officer Smith assaulted and manipulated his words to involuntarily commit Mr. Davenport.[83] Mr. Davenport alleges Officer Smith placed him in an arm-bar, handcuffed him, and misconstrued Mr. Davenport's words by claiming Mr. Davenport felt suicidal.[84] Mr. Davenport alleges Officer Smith used his coerced suicidal statement to involuntarily commit Mr. Davenport under § 302.[85]

Construing Mr. Davenport's complaint in the light most favorable to him, he fails to allege Officer Smith and Detective Prouty violated his Second Amendment rights. Mr. Davenport alleges the officers took steps which eventually resulted in a "violation of [Mr. Davenport's] Second Amendment rights."[86] Mr. Davenport does not allege he ever owned a firearm, nor does he allege either officer prevented him from possessing a firearm.[87] Regardless,

a thorough search of the case law fails to show Second Amendment violations when police make deceitful statements during involuntarily commitments. Even assuming Officer Smith and Detective Prouty lied while involuntarily committing Mr. Davenport, these actions did not prevent Mr. Davenport from possessing a firearm. Mr. Davenport fails to state a Second Amendment claim against Officer Smith and Detective Prouty.

### 2. Mr. Davenport fails to plead First or Second Amendment claims against Mr. Ortiz or Dr. Franz.

Mr. Davenport alleges § 1983 claims against Mr. Ortiz and Dr. Franz, alleging they violated his First Amendment rights by failing to provide him with kosher food on Shabbat.[88] Mr. Davenport alleges Mr. Ortiz violated his religious rights by 1) failing to conform to his religious dietary restrictions, 2) pressuring him to sign documents on Shabbat, and 3) "using [Mr. Davenport's] beard and hair, which was within a religious appropriate style, as a way of supporting medical and psychological claims against [him]."[89]  Mr. Davenport also alleges Second Amendment claims alleging Mr. Ortiz "worked and conspired with" the police officers to complete the requisite form to have him involuntarily committed which, in turn,  resulted in the loss of his right to possess a firearm.[90]

For Mr. Ortiz to be liable, Mr. Davenport must first plead he committed the alleged misconduct "under color of state law."[91]  For liability under the United States Constitution, Mr. Ortiz's alleged misconduct must involve "state action."[92]  The "principal question" is whether there exists a "close nexus" between the state and Mr. Ortiz's alleged misconduct allowing us to conclude the "private behavior may be fairly treated as that of the State itself."[93]

Our court of appeals devised three tests to determine if state action exists: "(1) whether the private entity has exercised powers that are traditionally the exclusive prerogative of the state; (2) whether the private party has acted with the help of or in concert with state officials;

and (3) whether the state has so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity."[94] Under each test, "the inquiry is fact-specific."[95]

A decision made by "private parties according to professional standards that are not established by the state" is not state action.[96] In *Polk County v. Dodson*, our Supreme Court held a public defender does not act "under color of state law" when his decisions "in the course of representing his client were framed in accordance with professional canons of ethics, rather than dictated by any rule of conduct imposed by the State" even though the state employed the defender and appointed him to represent a defendant.[97] The Court concluded the defender's "assignment entailed functions and obligations in no way dependent on state authority."[98]

"A private actor and a public actor working in concert can form a civil conspiracy to violate an individual's civil rights under section 1983."[99] For a § 1983 conspiracy claim, Mr. Davenport must plead "with particularity the 'circumstances' of the alleged wrong doing in order to place the defendants on notice of the precise misconduct with which they are charged."[100] He must address: "(1) the period of the conspiracy, (2) the object of the conspiracy, and (3) certain actions of the alleged conspirators taken to achieve that purpose."[101] A private entity's acts may be attributable to the state where the actor invokes the aid of state officials to take advantage of state procedures.[102] In *Lugar v. Edmondson Oil Co.*, the Supreme Court held "a private party's joint participation with state officials in the seizure of disputed property is sufficient to characterize that party as a 'state actor' for purposes of the Fourteenth Amendment."[103]

A plaintiff claiming a § 1983 violation must allege specific facts connecting the private party's actions to the conspiracy.[104] In *Labolokie v. Capital Area Intermediate Unit*, the plaintiff brought a § 1983 conspiracy claim against a corporate entity and two of its agents after the

defendants barred his ability to contract with the company.[105] The court found the plaintiff failed to state a claim against one of the agents because, while the plaintiff identified the time period of the alleged conspiracy and the object of the conspiracy (preventing him from contracting with the company), he did not allege "specific conduct whatsoever connecting" the agent with the conspiracy.[106] The plaintiff alleged his "termination" occurred with the agent's "'agreement' and 'support'" and the agent "since 'continued, up-held, ratified, and approved the wrongful acts,'" which the court found to be inadequate "conclusory allegations" without an "underlying factual scenario involving [the agent] about which the conclusions could be said to be true or false."[107]

      **i.**        **Mr. Davenport fails to plead First or Second Amendment claims against Mr. Ortiz.**

Mr. Davenport fails to allege facts Mr. Ortiz acted "under color of state law" when soliciting a signature on the commitment form from him. Similar to the plaintiff in *Dodson* who failed to allege the defender acted "under color of state law" and not in accord with his professional standards as an attorney when representing his client,[108] Mr. Davenport fails to allege facts indicating Mr. Ortiz acted "under color of state law" and not according to his professional judgment as an employee of the Hospital. He alleges "Defendant Jesse Smith and Defendant Ortiz are known at this time to be directly responsible for the attempts to coerce a signature from [Mr. Davenport] on Shabbat."[109] Mr. Davenport does not indicate such a procedure exceeded the professional standards of Mr. Ortiz's position as an employee of the hospital. He does not allege facts indicating Mr. Ortiz's actions depended on authority from the state or showing he worked directly with Officer Smith or any other state actor to prepare the 302 form or compel Mr. Davenport to sign the 201 form. The mere fact the police officers allegedly coerced Mr. Davenport to sign the 201 form[110] and encouraged the 302 commitment[111]

does not indicate Mr. Ortiz acted "under the color of state law" when he allegedly acted to "coerce a signature from [Mr. Davenport] on Shabbat"[112] and helped prepare the 302 form[113] in his capacity as an employee of the Hospital.

Mr. Davenport also failed to allege facts to support a § 1983 conspiracy claim because he failed to establish Mr. Ortiz worked in concert with a state actor to deprive Mr. Davenport of his civil rights. Similar to the plaintiff in *Labolokie* who alleged the time period and object of the conspiracy without pleading facts connecting the agent to the alleged conspiracy,[114] Mr. Davenport failed to plead facts connecting Mr. Ortiz to a conspiracy to deprive him of his rights. He alleges "Defendant Jesse Smith and Defendant Ortiz are known at this time to be directly responsible for the attempts to coerce a signature from [Mr. Davenport] on Shabbat."[115] He alleges "[t]he pressuring to sign documents included threats of incarceration and criminal charges against [him] for not signing documents on Shabbat" and "Defendants" referred to his "beard and hair, which was within a religious appropriate style, as a way of supporting medical and psychological claims against" him.[116] Mr. Davenport does not specifically identify the "Defendants" or identify Mr. Ortiz as one who threatened him with incarceration or criminal charges or used his appearance as a means of "supporting medical and psychological claims against" him.[117] Mr. Davenport alleges Mr. Ortiz "[is] known at this time to be directly responsible for the attempts to coerce a signature from [Mr. Davenport] on Shabbat"[118] and helped to complete and "[secure] approval of the 302 form,"[119] but does not plead facts of Mr. Ortiz acting in furtherance of a conspiracy with the police officers. Mr. Davenport claims Mr. Ortiz "worked and conspired" with the officers to have him involuntarily committed "which led to the violation of [his] second amendment rights."[120] This is the type of conclusory allegation

found to be inadequate in *Labolokie* as it fails to plead what actions Mr. Ortiz took when he "worked and conspired" with the officers.

We find Mr. Davenport failed to allege facts demonstrating Mr. Ortiz acted "under color of state law." We dismiss his First and Second Amendment claims against Mr. Ortiz.

### ii. Mr. Davenport fails to state a First Amendment claim against Dr. Franz.

Mr. Davenport fails to allege Dr. Franz is a state actor. Mr. Davenport does not plead facts showing Dr. Franz exercised authority traditionally reserved for the state, received help from the state, or insinuated herself into a position of interdependence with the state. Instead, Mr. Davenport's First Amendment claim only mentions Dr. Franz in the claim caption.[121] Mr. Davenport does not allege Dr. Franz participated in serving Mr. Davenport's non-kosher food. Mr. Davenport only claims the timeframe of Dr. Franz's care overlapped with the other alleged First Amendment violations.[122] His conclusory allegations do not state a First Amendment claim against Dr. Franz under § 1983.

### B. Mr. Davenport does not plead a supervisory liability claim against the Police Department.

Mr. Davenport alleges the Police Department is liable for failure to "adequately hire, train, supervise, and/or otherwise direct its employees establish a system to identify or report improper conduct, and adequately sanction and discipline its employees … concerning the rights of citizens."[123] He alleges the Police Department through Officer Hipple, Detective Prouty, and Officer Smith violated his constitutional rights under the First, Second, Fourth, and Fourteenth Amendments.

A municipality may be liable under § 1983 when its policy or custom causes the constitutional violation.[124] To plead a *Monell* claim, Mr. Davenport must allege: "(1) he

possessed a constitutional right of which he was deprived; (2) the municipality had a policy [or custom]; (3) the policy [or custom] 'amounted to deliberate indifference' to his constitutional right; and (4) the policy [or custom] was the 'moving force' behind the constitutional violation."[125]

Liability for failure to train subordinate officers lies only where a constitutional violation results from "deliberate indifference to the constitutional rights of [the municipality's] inhabitants."[126] "A single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."[127]

To succeed on a failure to train claim, Mr. Davenport must plead the Police Department, the policymaker, made a "deliberate" or "conscious" decision to not train or supervise.[128] "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for . . . failure to train."[129] Mr. Davenport only pleads the Police Department generally does not train its officers on "the rights of citizens." Mr. Davenport does not plead which constitutional rights the Police failed to train. He also does not plead a pattern of similar constitutional violations.

Alternatively, Mr. Davenport may prove deliberate indifference by showing: "(1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights."[130]

Mr. Davenport fails to plead the Police Department had contemporaneous knowledge of constitutional violations or facts to indicate a pattern of similar violations. He does not meet the pleading standard because he does not plead the Police Department's "policy [or custom]

'amounted to deliberate indifference'" by demonstrating a pattern of violations beyond the violation of his constitutional rights.[131] He also fails to plead Police officers and detectives acted under a policy which "was the 'moving force' behind the constitutional violations."[132] We grant the Police Department's motion to dismiss Mr. Davenport's *Monell* claim.

### C.  Mr. Davenport does not plead a claim against the Police Department under the Religious Freedom Restoration Act.

Mr. Davenport alleges the Police Department substantially burdened his free exercise of religion under the Religious Freedom Restoration Act of 1993, 42 U.S.C. § 2000bb by pressuring him to sign documents during Shabbat without compelling justification.[133]  This statute is unconstitutional as applied to states and their agencies such as police departments.[134]

We dismiss Mr. Davenport's claim under the federal Religious Freedom Restoration Act of 1993.

### D.  Mr. Davenport does not plead a claim under 71 Pa. Stat. Ann. § 2404.

Mr. Davenport alleges the Police Department substantially burdened his free exercise of religion under Pennsylvania's Religious Freedom Restoration Act (Act) by pressuring him to sign documents during Shabbat without compelling justification.[135] The Act prohibits "an agency" from "substantially burden[ing] an individual's free exercise of religion, including any burden which results from a rule of general applicability" unless the agency has a compelling government interest and the burden is the least restrictive means necessary.[136]  Liberally construing his complaint, Mr. Davenport alleges the Police Department substantially burdened his religious observance of Shabbat by attempting to enforce Pennsylvania's Mental Health Procedures Act on Shabbat.  He argues Officer Smith's attempt to coerce him to sign a corrected copy of his voluntary commitment form in compliance with the Act violated his observance of Shabbat's restriction on making agreements and signing documents.

Pennsylvania requires an individual asserting a violation under the Act to provide statutory notice to the agency before bringing a judicial action.[137]  Mr. Davenport does not plead what, if any, notice he provided the Police Department before filing this claim and does not plead one of the four statutory exceptions to notice.[138]  While no Pennsylvania courts have addressed notice requirements, another district court held "[b]ecause compliance with a statutory notice provision is a prerequisite to jurisdiction, the failure to comply with such a provision renders the court unable to hear the claim."[139]

We dismiss Mr. Davenport's claim under Pennsylvania's Religious Freedom Restoration Act.

**E.  Mr. Davenport does not plead a claim against Officer Smith for malicious prosecution.**

Mr. Davenport alleges Officer Smith maliciously prosecuted him by withholding information and/or providing false information.  To state a claim for malicious prosecution, Mr. Davenport must first allege Officer Smith "initiated a criminal proceeding" against him.[140]  Mr. Davenport does not allege Officer Smith initiated criminal proceedings against him.  Instead he alleges Officer Smith threatened him with criminal prosecution if he did not sign a voluntary commitment form which is more appropriate under his Fourth Amendment claim against Officer Smith.  We dismiss Mr. Davenport's malicious prosecution claim against Officer Smith because he does not allege Officer Smith initiated a criminal prosecution against him.

**F.  Mr. Davenport fails to plead a reasonable explanation or legitimate excuse for his continuing failure to adduce a certificate of merit necessary for pleading medical negligence.**

Mr. Davenport alleges medical negligence claims against Dr. Franz and Nurse Andrews, and medical negligence and corporate negligence claims against the Hospital. Mr. Davenport alleges all three defendants failed to manage his confusion and disorientation, failed to

adequately supervise and monitor him, and failed to properly maintain his medical records. He claims the Hospital failed to employ, train, manage, and retain competent staff, maintain its facilities and equipment, and "establish policies and procedures that address the needs and concerns of the patients."[141] We previously dismissed Mr. Davenport's medical negligence claim as pleaded in his First Amended complaint because Mr. Davenport did not file a certificate of merit within 60 days of his first complaint.[142] We provided Mr. Davenport the opportunity to present "further evidence sufficient to establish a reasonable explanation or legitimate excuse for his noncompliance with the certificate of merit requirement" in order to reinstate his claim[143]

"Under Pennsylvania law, medical negligence 'can be broadly defined as the unwarranted departure from generally accepted standards of medical practice resulting in injury to a patient, including all liability-producing conduct arising from the rendition of professional medical services.'"[144] Pennsylvania law requires a certificate of merit in cases "based upon an allegation that a licensed professional deviated from an acceptable professional standard."[145] This rule also applies to claims alleging corporate negligence for the conduct of a corporation's employees.[146] A certificate must be filed within sixty days of filing the complaint.[147] The sixty-day period begins after the filing of the initial complaint alleging professional negligence[148] and the period does not restart if a complaint is amended.[149] A plaintiff showing good cause has the opportunity to move for an extension of an additional sixty days.[150] The Pennsylvania Supreme Court adopted the certificate of merit requirement as "an orderly procedure that would serve to identify and weed non-meritorious malpractice claims from the judicial system efficiently and promptly."[151]

Rule 1042.3(a)(3) allows a party or attorney representing a party to provide a signed certificate of merit certifying, "expert testimony of an appropriate licensed professional is

unnecessary for prosecution of the claim."[152]  The certificate of merit requirement applies to *pro se* medical malpractice plaintiffs "with equal force to counseled complaints."[153]  "[A] *pro se* litigant's ignorance of or mistaken assumptions about the requirements of Rule 1042.3 cannot serve as a reasonable excuse."[154]

The Pennsylvania Supreme Court directs courts to afford a party failing to comply with the certificate of merit requirement the opportunity to provide a reasonable explanation or legitimate excuse for his noncompliance.  A noncomplying party may have recourse "if he can file a proper certificate of merit and 'demonstrate a reasonable explanation or legitimate excuse for untimely filing.'"[155]  "State and federal courts following *Womer* have held that it 'dictates a very strict interpretation of the [certificate of merit] Rule and sets a high bar for establishing a reasonable excuse' for failing to timely comply with the [certificate of merit] requirement."[156]

When considering the reasonableness of a party's failure to timely file a certificate of merit, courts look to the party's attempts to comply with the sixty-day deadline.[157]  In *Ramos v. Quien*, the court found the plaintiff took measures to comply with the sixty-day deadline by seeking a time extension before the limitation period expired and filing a certificate of merit before the expiration of the extension.[158]  The plaintiff's counsel advanced "a number of legitimate excuses" for failing to file a certificate of merit within the sixty day period: "(1) he had exhausted his contingency fees; (2) he unsuccessfully attempted to refer Plaintiff's case to a number of firms; and (3) he was in the process of litigating abroad to secure visas for his fiancée and her son."[159]  The court concluded the plaintiff's actions "clearly did not amount to a 'wholesale failure to take any actions,'" and accepted the untimely certificate of merit because doing so did not prejudice the opposing party and the "[p]laintiff's late filing may be excused here under the doctrine of substantial compliance."[160]

Substantial compliance with Pa.R.C.P. No. 1042.3 may constitute a reasonable excuse for failure to file a timely certificate of merit.[161]  In *Womer v. Hilliker*, the plaintiff did not file a certificate of merit with his complaint or within the sixty-day period after filing it, and he did not move to extend the time period past the sixty-days permitted under Pa.R.C.P. No. 1042.3.[162]  The plaintiff argued he "substantially complied with Pa.R.C.P. No. 1042.3" by providing the defendant a report from an expert even if he did not properly file a certificate of merit.[163]  The plaintiff blamed his failure to timely file on "his counsel's oversight or mistake."[164]  The court found the plaintiff failed to present a reasonable excuse for noncompliance with Pa.R.C.P. No. 1042.3.[165]  *Womer* "dictates a very strict interpretation of the [certificate of merit] Rule and sets a high bar for establishing a reasonable excuse" for failing to timely file.[166]

The court in *Ramos v. Quien* excused the plaintiff's untimely certificate of merit filing and found the plaintiff's actions substantially complied with Rule 1042.3.[167]  The plaintiff sought a time extension from the state court before the expiration of the sixty-day time limit and filed the certificate of merit in federal court before to the expiration of his forty-five day extension.[168]  The state court did not have jurisdiction to grant the extension due to the case's removal to federal court.[169]  The court excused the plaintiff's late filing under the doctrine of substantial compliance and found the "[p]laintiff's actions clearly did not amount to a 'wholesale failure to take any actions,'" and accepting the untimely certificate of merit would not prejudice the opposing party.[170]

Mr. Davenport claims he did not file a timely certificate of merit because he "believed that the extension to file an amended complaint also extended the time to file the certificate of merit."[171]  Mr. Davenport is comparable to the plaintiff in *Womer*, who failed to take action to comply with the sixty-day time limit.  He did not seek an extension of time to file the certificate

of merit and, as in *Womer*, his ignorance or mistake of the law does not provide a reasonable excuse.

Mr. Davenport now wishes to file a certificate of merit under Rule 1042.3(a)(3), which allows either an attorney representing a plaintiff or the plaintiff if unrepresented to file a signed certificate of merit, "expert testimony of an appropriate licensed professional is unnecessary for prosecution of the claim."[172] He never explains why he did not move to extend his deadline.

Pennsylvania law provides "[a] very narrow exception to the requirement of expert testimony in medical malpractice actions applies 'where the matter is so simple or the lack of skill or care so obvious as to be within the range of experience and comprehension of even non-professional persons.'"[173]   This is the *res ipsa loquitur* doctrine where "an inference of negligence may be raised without direct evidence of the negligent act if three conditions exist: (1) the injury must be of a type not ordinarily occurring absent negligence; (2) the defendant must have had exclusive control of the instrumentality effecting the injury; and (3) the plaintiff must not have contributed to the injury."[174]

Even if Mr. Davenport's medical and corporate negligence claims satisfied the doctrine of *res ipsa loquitur* for Rule 1042.3(a)(3) to apply, he still failed to establish a reasonable excuse for his failure to timely file his certificates of merit.  We grant the Hospital's motion to dismiss the medical and corporate negligence claims.

**G. Mr. Davenport's claims for intentional infliction of emotional distress may proceed against all Defendants other than the Police Department.**

Mr. Davenport alleges all Defendants intentionally inflicted emotional distress upon him. To plead an intentional infliction of emotional distress claim under Pennsylvania law, Mr. Davenport must allege each defendant (1) engaged in intentional or reckless conduct; (2) to an extreme and outrageous level; (3) which actually caused the distress; and (4) the distress is

severe.[175]  "In Pennsylvania, '[l]iability on an intentional infliction of emotional distress claim has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'"[176]  A plaintiff must plead facts demonstrating outrageous conduct by each defendant.[177]

To maintain his claim for intentional infliction of emotional distress, Mr. Davenport must allege that he suffered "severe" emotional distress resulting from each Defendant's conduct.[178] "Fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry and nausea" all indicate "severe" emotional distress.[179]  His allegations of physical injury must accompany alleged emotional distress.[180]  In *Lane*, the party alleged she "continue[d] to suffer 'fear, anxiety, stress, anger, headaches, nightmares, humiliation, embarrassment, emotional distress [and] mental anguish'" which the court found sufficient to raise an inference of severe emotional distress."[181]

### 1. Mr. Davenport pleads an emotional distress claim against the Hospital.

We previously found Mr. Davenport plead a claim for emotional distress against the Hospital.[182]  We again deny the Hospital's motion to dismiss this claim for the same reasons.

### 2. Mr. Davenport fails to state a claim for intentional infliction of emotional distress against the Police Department.

Mr. Davenport fails to state an intentional infliction of emotional distress claim against the Police Department. Mr. Davenport's claim against the Police Department is prohibited by Pennsylvania Political Subdivision Tort Claims Act.[183]  The Tort Claims Act protects political subdivisions from liability for acts committed by the subdivision's employees.[184]  The statute also specifically exempts local agencies from all acts that constitute "crimes, actual fraud, malice or willful misconduct."[185] Because intentional torts are willful misconduct, municipalities cannot

be liable for claims of intentional infliction of emotional distress.[186]  Therefore, we grant the Police Department's motion to dismiss this claim.

### 3. Mr. Davenport states a claim for intentional infliction of emotional distress against the individual Defendants.

We next determine whether the Mr. Davenport states a claim for intentional infliction of emotional distress against Officer Smith, Officer Hipple, Detective Prouty, Nurse Andrews, Dr. Franz, and Mr. Ortiz.[187]

Accepting all of Mr. Davenport's factual allegations as true and construing his second amended complaint in the light most favorable to him, Mr. Davenport states an intentional infliction of emotional distress claim against Officer Smith because he alleges Officer Smith assaulted him and physically coerced him into signing voluntary commitment documents and agreeing he was suicidal.[188]  Mr. Davenport claims Officer Hipple transported him on Shabbat against his wishes and religious beliefs.[189] Mr. Davenport alleges Detective Prouty lied to him and threatened Mr. Davenport with criminal prosecution if he did not submit to a mental health evaluation.[190]

As for the Hospital employees, Mr. Davenport alleges Dr. Franz and Nurse Andrews kept him confined to a room, failed to provide him with any furniture for an extended period of time, misused Mr. Davenport's statements to involuntarily commit him, and allowed others to take aggressive physical action against Mr. Davenport while Mr. Davenport regained consciousness.[191]  Mr. Davenport alleges Mr. Ortiz conspired with Officer Smith and Detective Prouty to involuntarily commit Mr. Davenport and deprive Mr. Davenport of his Second Amendment rights.[192]

Mr. Davenport also alleges the "extreme and outrageous" conduct caused him "further disorientation and confusion."[193]  He claims he required therapy from a psychologist to process

and heal from the damages inflicted upon him and suffered "physical injury and pain."[194] This conduct and its effect on Mr. Davenport, when taken as a whole, sufficiently states a claim for intentional infliction of emotional distress at this stage. Mr. Davenport sufficiently pleads physical harm or injury for necessary infliction of emotional distress. We deny all remaining motions to dismiss.

## III. Conclusion

We grant in part and deny in part Defendants' respective motions to dismiss Mr. Davenport's second amended complaint against them.[195] We dismiss Mr. Davenport's First and Second Amendment claims against the Police Department because the Police Department is not an actor who violated Mr. Davenport's rights. We dismiss Mr. Davenport's First Amendment claims against Officer Hipple, Officer Smith, and Detective Prouty because Mr. Davenport has not plead the existence of clearly established First Amendment rights or alleged how the officers violated his rights. We dismiss Mr. Davenport's First Amendment claim against Dr. Franz and Mr. Ortiz because he has not alleged they are state actors under § 1983. We dismiss Mr. Davenport's Second Amendment claim against Officer Smith, Detective Prouty and Mr. Ortiz because they did not prevent Mr. Davenport from possessing a firearm. We do not dismiss Mr. Davenport's Fourth Amendment claim against Officer Smith because Officer Smith does not move to dismiss it.

We dismiss Mr. Davenport's *Monell* claim against the Police Department because he does not plead which constitutional rights the Police Department failed to train on, or allege a pattern or practice of constitutional violations.

We dismiss Mr. Davenport's medical and corporate negligence claims against the Hospital, Dr. Franz, and Nurse Andrews because he failed to timely file a required certificate of merit. We dismiss Mr. Davenport's federal Religious Freedom Restoration Act claim because the statute he

relies on is unconstitutional as applied to the states. We dismiss Mr. Davenport's Pennsylvania Religious Freedom Restoration Act claim because Mr. Davenport failed to comply with the statutory notice requirements. We dismiss Mr. Davenport's malicious prosecution claim against Officer Smith because Officer Smith did not file criminal charges against Mr. Davenport. We dismiss Mr. Davenport's claims for intentional infliction of emotional distress against the Police Department because Mr. Davenport's claim is prohibited by the Pennsylvania Political Subdivision Tort Claims Act. We do not dismiss Mr. Davenport's claims for intentional infliction of emotional distress against the remaining Defendants.

Mr. Davenport will proceed to discovery on his Fourth Amendment §1983 claim against Officer Smith and his intentional infliction of emotional distress claim against the Defendants other than the Police Department.

---

[1] Amended Complaint, ECF Doc. No. 37, ¶ 13.

[2] *Id.*

[3] *Id.* ¶ 14.

[4] *Id.* ¶ 15.

[5] *Id.* ¶ 16.

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] *Id.* ¶ 17.

[10] *Id.* ¶ 18.

[11] *Id.*

[12] *Id.*

[13] *Id.* ¶ 19.  It is unclear if the North Coventry Township Police are Officer Hipple and Detective Prouty and if they took him into custody from the grocery store.

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *Id.* ¶ 20.

[19] *Id.*

[20] *Id.*

[21] *Id.* ¶ 25.

[22] *Id.* ¶ 26.

[23] *Id.* ¶ 27.

[24] *Id.* ¶ 30.

[25] *Id.* ¶ 28.

[26] *Id.* ¶ 29.

[27] *Id.* ¶ 64.

[28] *Id.* ¶ 55, 66.

[29] *Id.* ¶ 69.

[30] *Id.* ¶ 31.

[31] *Id.* ¶ 32.

[32] *Id.* ¶ 33.

[33] *Id.* ¶ 34.

[34] *Id.* ¶ 39.

[35] *Id.* ¶¶ 36-37.

[36] *Id.* ¶ 35.

[37] *Id.*

[38] *Id.* ¶ 40.

[39] *Id.* ¶ 40, 48.

[40] *Id.*

[41] *Id.* ¶ 41.

[42] *Id.* ¶¶ 42-43.

[43] *Id.* ¶¶ 71-73.

[44] *Id.* ¶ 43.

[45] *Id.* ¶ 47.

[46] *Id.* ¶ 49.

[47] *Id.* ¶ 44.

[48] *Id.*

[49] *Id.*

[50] *Id.*

[51] *Id.* ¶ 45.

[52] *Id.*

[53] *Id.* ¶ 46.

[54] *Id.* ¶ 44.

[55] *Id.* ¶ 46.

[56] *Id.*

[57] *Id.* ¶ 50.

[58] *Id.* ¶¶ 67-68.

[59] *Id.* ¶ 92-93.

[60] *Id.* ¶ 90.

[61] *Id.* ¶ 91.

[62] *Id.* ¶¶ 86-88.

[63] "In reviewing a dismissal under Federal Rule of Civil Procedure 12(b)(6), we accept all factual allegations as true, construing the complaint in the light most favorable to the plaintiff." *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011). We grant a motion to dismiss "only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court finds that plaintiff's claims lack facial plausibility." *Id.*

[64] *See id.* at 146 (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972) and *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 245 (3d Cir. 2013)). Our court of appeals instructs: "Our policy of liberally construing pro se submissions is driven by the understanding that [i]mplicit in the right of self-representation is an obligation on the part of the court to make reasonable allowances to protect pro se litigants from inadvertent forfeiture of important rights because of their lack of legal training." *Higgs v. Atty. Gen. of the US.*, 655 F.3d 333, 339 (3d Cir.2011) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 475 (2d Cir.2006)) (internal quotation marks omitted).

Our court of appeals consistently demands a civil rights complaint contain "a modicum of factual specificity, identifying the particular conduct of defendants that is alleged to have harmed the plaintiffs" but does not consider this requirement inconsistent with *Haines. Ross v. Meagan*, 638 F.2d 646, 650 (3d Cir. 1981). "Our case law requires dismissal of complaints which 'contain only vague and conclusory allegations.'" *Id* (citing *Rotolo v. Borough of Charleroi*, 532 F.2d 920, 922-23 (3d Cir. 1976); *Kauffman v. Moss*, 420 F.2d 1270, 1275-76 & n.15 (3d Cir.), *cert. denied*, 400 U.S. 846 (1970); *Negrich v. Hohn*, 379 F.2d 213 (3d Cir. 1967)).

[65] *Schneyder v. Smith*, 653 F.3d 313, 319 (3d Cir. 2011).

[66] *Gannaway v. Prime Care Medical, Inc.*, 150 F. Supp. 3d 511, 526 (3d Cir. 2015) (internal citations omitted).

[67] *Id.* (citing *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1998)).

[68] ECF Doc. No. 37 ¶ 71.

[69] *Mann v. Palmerton Area Sch. Dist.*, --- F.3d ---, No. 16-2821, 2017 WL 4172055, at *2 (3d Cir. Sept. 21, 2017), *as amended* (Sept. 22, 2017)(citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)).

[70] *Mann*, --- F.3d ---, No. 16-2821, 2017 WL 4172055, at *5 (3d Cir. Sept. 21, 2017)(citing *Wilson v. Layne*, 526 U.S. 603, 615(1999)).

[71] *Id.* at 641.

[72] *Id.* at 640.

[73] *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)(citing *Hunter v. Bryant,* 502 U.S. 224, 227 (1991)(*per curiam*)).

[74] *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

[75] *Id.*

[76] *Pearson*, 555 U.S. at 236.

[77] *Id.*

[78] *Pearson*, 555 U.S. at 231.

[79] ECF Doc. No. 37, ¶ 73.

[80] *Id.* ¶¶ 56.

[81] *Id.* ¶¶ 71, 72.

[82] *Id.* ¶ 90.

[83] *Id.* ¶ 86.

[84] *Id.* ¶¶ 44, 45.

[85] *Id.* ¶ 46.

[86] *Id.* ¶ 89.

[87] Mr. Davenport may have a Second Amendment claim against a state agency, but those claims are not before us here. Once a person has been involuntarily committed under § 302, Pennsylvania state law prohibits them from possessing a firearm. 18 Pa.C.S. § 1605(c)(4). The Mental Health Procedures Act requires the committing facility to notify the Pennsylvania State Police of the involuntary commitment within seven days. *Id.* The Pennsylvania State Police

prohibits involuntarily committed persons from possessing firearms. *Doe v. Wolf*, No. CV 16-6039, 2017 WL 3620005, at *4 (E.D. Pa. Aug. 23, 2017) (citing 50 Pa. Stat. § 7302).

[88] ECF Doc. No. 37, ¶ 67.

[89] *Id.* ¶¶ 59-78.

[90] *Id.* ¶¶ 88-89.

[91] *Sprauve v. W. Indian Co.*, 799 F.3d 226, 229 (3d Cir. 2015) (quoting *Groman v. Twp. of Manalapan*, 47 F.3d 628, 638 (3d Cir. 1995)).

[92] *Sprauve,* 799 F.3d at 229 (quoting *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 937 (1982).

[93] *Kach v. Hose*, 589 F.3d 626, 646 (3d Cir. 2009) (quoting *Leshko*, 423 F.3d at 339).

[94] *Kach*, 589 F.3d at 646 (quoting *Mark v. Borough of Hatboro,* 51 F.3d 1137, 1142 (3d Cir. 1995)).

*Id.* (quoting *Groman*, 47 F.3d at 638) (brackets omitted).

[96] *Blum v. Yaretsky*, 457 U.S. 991, 1008 (1982).

[97] *Blum*, 457 U.S. at 1009 (citing *Polk County v. Dodson*, 454 U.S. 312 (1981)).

[98] *Polk*, 454 U.S. at 318.

[99] *Hennessy v. Santiago*, 708 A.2d 1269, 1277 (Pa.Super. 1998)(citing *Adickes v. Kress & Co.*, 398 U.S. 144, 150-52 (1970)).

[100] *Labalokie v. Capital Area Intermediate Unit*, 926 F.Supp. 503, 508-09 (M.D.Pa. 1996)(quoting *Rose v. Bartle*, 871 F.2d 331, 366 (3d Cir. 1989)).

[101] *Labalokie*, 926 F.Supp. at 508-09 (quoting *Rose*, 871 F.2d at 366).

[102] *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 942 (1982).

[103] *Id.* at 941.

[104] *Labalokie*, 926 F.Supp. at 508-09

[105] *Id*. at 509.

[106] *Id.*

[107] *Id.*

[108] *Polk*, 454 U.S. at 318.

[109] ECF Doc. No. 37 at ¶ 73.

[110] *Id.* ¶ 17.

[111] *Id.* ¶ 88.

[112] *Id.* ¶ 73.

[113] *Id.* ¶ 88.

[114] *Labalokie*, 926 F.Supp. at 509.

[115] ECF Doc. No. 37, ¶ 73.

[116] *Id.* ¶¶ 72, 74.

[117] *Id.* ¶ 74.

[118] *Id.* ¶ 73.

[119] *Id.* ¶ 88.

[120] *Id.* ¶¶ 88-89.

[121] ECF Doc. No. 37 at 15.

[122] Mr. Davenport's Response and Opposition to Dr. Franz's Motion to Dismiss, ECF Doc. No. 45, p 1.

[123] *Id.* ¶ 87.

[124] *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978); see also *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989).

[125] *Vargas v. City of Philadelphia*, 783 F.3d 962, 974 (3d Cir. 2015) (quoting *City of Canton*, 489 U.S. at 389–91)).

[126] *City of Canton*, 489 U.S. at 392.

[127] *Oklahoma City v. Tuttle,* 471 U.S. 808, 823–24 (1985).

[128] *See City of Canton*, 489 U.S. at 389.

[129] *Simpson v. Ferry*, 202 F. Supp. 3d 444, 455 (E.D. Pa. 2016) (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011) and *Bd. of Cnty. Commrs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 409, (1997)).

[130] *Simpson*, 202 F. Supp. 3d at 455 (citing *Ancherani v. City of Scranton*, No. 13-2595, 2015 WL 5924366 at *4 (M.D. Pa. Oct. 9, 2015) and *Carter v. City of Philadelphia*, 181 F.3d 339, 357 (3d Cir. 1999)).

[131] *Vargas*, 783 F.3d at 974 (quoting *City of Canton*, 489 U.S. at 389–91)).

[132] *Id.*

[133]  42 U.S.C. § 2000bb.

[134] *City of Boerne v. Flores*, 521 U.S. 507, 511 (1997) ("The case calls into question the authority of Congress to enact RFRA. We conclude the statute exceeds Congress' power")'

[135] 71 Pa. Stat. Ann. § 2404.

[136] *Id.*

[137] *Id.* § 2405(b).

[138] *See id.* § 2405(c).  Allowing an individual to bring a judicial action without notice "if any of the following occur: (1) The exercise of governmental authority which threatens to substantially burden the person's free exercise of religion is imminent. (2)  The person was not informed and did not otherwise have knowledge of the exercise of the governmental authority in time to reasonably provide notice. (3) The provision of the notice would delay an action to the extent that action would be dismissed as untimely. (4) The claim or defense is asserted as a counterclaim in a pending proceedings."

[139] *Webb v. City of Philadelphia*, No. 05-5238, 2007 WL 576313 at *3 (E.D. Pa. Feb. 20, 2007) (citing *Noxon Chem. Prods. Co. v. Leckie*, 39 F.2d 318, 320 (3d Cir. 1930); *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 47 (1974)).

[140] *Andrews v. Scuilli*, 853 F.3d 690, 697 (3d Cir. 2017) (quoting *DiBella v. Borough of Beachwood*, 407 F.3d 599, 601 (3d Cir. 2005)).

[141] *Id.* at ¶ 111.

[142] ECF Doc. No. 20 at 12-13.

[143] *Id*. at 13.

[144] *Goodfellow v. Camp Netimus, Inc.*, 2017 WL 1738398, at *7 (M.D.Pa. May 4, 2017)(quoting *Toogood v. Owen J. Rogal, D.D.S., P.C.*, 824 A.2d 1140, 1145 (Pa. 2003)).

[145] Pa. R. Civ. P. 1042.3(a) provides a plaintiff must file a certificate of merit signed by either the attorney or party certifying: "(1) an appropriate licensed professional has supplied a written statement that there exists a reasonable probability that the care, skill or knowledge exercised or exhibited in the treatment, practice or work that is the subject of the complaint, fell outside acceptable professional standards and that such conduct was a cause in bringing about the harm, or (2) the claim that the defendant deviated from an acceptable professional standard is based solely on allegations that other licensed professionals for whom this defendant is responsible deviated from an acceptable professional standard, or (3) expert testimony of an appropriate licensed professional is unnecessary for prosecution of the claim."

[146] *Kukos v. Chester Cnty.*, No. 16-4602, 2017 WL 549150, at *4 (E.D.Pa. 2017).

[147] Pa. R. Civ. P. 1042.3(a).

[148] *Talbert v. Correctional Dental Associates*, No. 16-1408, 2017 WL 714031, at *3 (E.D.Pa., Feb. 22, 2017)(citing *O'Hara v. Randall*, 879 A.2d 240, 242 (Pa. Super. Ct. 2005)).

[149] *Parrish v. Corizon Health, Inc.*, 2016 WL 4123937, at *6 (E.D.Pa. 2016)(citing *O'Hara*, 879 A.2d at 245)).

[150] *Id.* at 1042.3(d).

[151] *Womer v. Hilliker*, 908 A.2d 269, 275 (Pa. 2006)(citing 42 Pa.C.S. § 1722)).

[152] Pa. R. Civ. P. 1042.3(a)(3).

[153] *Turner v. Lopez*, 2013 WL 6448313, at *11 (M.D.Pa. 2013)(citing *Hodge v. Dept. of Justice*, 372 Fed. App'x 264, 267 (3d Cir. 2010).

[154] *Perez v. Griffin*, 304 Fed. App'x 72, 75 (3d Cir. 2008)(citing *Hoover v. Davila*, 862 A.2d 591, 595-96 (Pa.Super. 2004)).

[155] *Turner*, 2013 WL 6448313, at * 11 (quoting *Ramos v. Quien*, 631 F.Supp.2d 601, 612 (E.D.Pa. 2008)).

[156] *Stroud v. Abington Memorial Hosp.*, 546 F.Supp.2d 238, 253 (E.D.Pa. 2008)(quoting *Walsh v. Consolidated Design & Eng'g, Inc.*,Civ. A. No. 05–2001, 2007 WL 2844829, *8 (E.D.Pa. Sept. 28, 2007)).

[157] *Ramos*, 631 F.Supp.2d at 612.

[158] *Id.*

[159] *Id.*

[160] *Id.*

[161] *Womer*, 908 A.2d at 280.

[162] *Id.* at 261.

[163] *Id.* at 264-65.

[164] *Id.* at 273.

[165] *Id.* at 280.

[166] *Stroud*, 546 F.Supp.2d at 247 (quoting *Womer*, 908 A.2d at 279).

[167] *Ramos*, 631 F.Supp.2d at 611.

[168] *Id.*

[169] *Id.*

[170] *Id.*

[171] ECF. Doc. No. 35 at 2.

[172] Pa. R. Civ. P. 1042.3(a)(3).

[173] *Toogood*, 824 A.2d at 1145 (quoting *Hightower-Warren v. Silk*, 698 A.2d 52, 54, n.1 (Pa. 1997)).

[174] *Toogood*, 824 A.2d at 1145 (Pa. 2003)(citing *Greathouse v. Horowitz*, 254 A.2d 665 (Pa. 1970)).

[175] *Regan v. Township of Lower Merion*, 36 F. Supp. 2d 245, 251 (E.D. Pa. 1999).

[176] *Kasper v. Cnty. of Bucks,* 514 Fed. App'x. 210, 217 (3d Cir. 2013) (internal citations and quotations omitted)

[177] *See Kazatsky v. King David Memorial Park, Inc.,* 515 Pa. 183, 527 A.2d 988, 991 (1987) (holding the tort of intentional infliction of emotional distress requires outrageous conduct on the part of the tortfeasor).

[178] *Lane v. Cole*, 88 F. Supp. 2d 402, 407 (E.D. Pa. 2000).

[179] *Id.* (quoting *Kazatsky v. King David Memorial Park, Inc.*, 527 A.2d 988, 991 (Pa. 1987) (quoting Restatement (Second) of Torts § 46 cmt. d)).

[180] *Id.*; *See also Corbett v. Morgenstern,* 934 F. Supp. 680, 684-85 (E.D. Pa. 1996) (symptoms of severe depression, nightmares, anxiety and ongoing mental or physical harm suffice).

[181] *Id.*

[182] ECF Doc. No. 20 at 14.

[183] 42 Pa. Cons.Stat. Ann. §§ 8541-8564.

[184] *Id.*

[185] 42 Pa. Cons.Stat. Ann. § 8542(a) (West 1998).

[186] *Naeem v. Bensalem Twp.*, No. CIV.A. 04-CV-1958, 2005 WL 696763, at *3 (E.D. Pa. Mar. 24, 2005)(citing *Latkins v. York,* 258 F.Supp.2d 401, 405 (E.D.Pa.2003)(internal quotations omitted)).

[187] *Id.*

[188] ECF Doc. No 37 ¶¶ 44-46, 71.

[189] *Id*. ¶¶ 25, 70.

[190] *Id*. ¶¶ 24, 90-91.

[191] *Id*. ¶¶ 121 (b)(ii), 121(e), 121(h)(iii), 121(h)(v).

[192] *Id*. ¶¶ 88-89.

[193] ECF Doc. No. 137-38.

[194] ECF Doc. No. 141.

[195] *Shane v. Fauver*, 213 F.3d 113, 117 (3d Cir. 2000) ("dismissal without leave to amend is justified only on the grounds of bad faith, undue delay, prejudice, or futility.").