# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RAYMOND SAMUEL DAVENPORT III | : CIVIL ACTION |
| v. | : |
| | : NO. 17-1616 |
| POTTSTOWN HOSPITAL COMPANY LLC, *et al.* | : |

## MEMORANDUM

**KEARNEY, J.**                                                                                                        **December 14, 2017**

We return to Raymond Davenport's *pro se* efforts to sue everyone involved with his hospital stay after some alleged confusion at a grocery store somehow resulted in his placement later the same day at Pottstown Memorial Hospital over Passover. We today address his claim a private hospital nurse violated his civil rights and caused him severe emotional distress by mistakenly characterizing his religious dietary requests in medical records as a fasting strike. After three attempts, Mr. Davenport does not come close to pleading how the private nurse is a state actor liable for civil rights claims. She is a nurse who mistakenly described his dietary issues based on his religious beliefs. There is no basis to find state action by her. We also find no possible pleading of facts – after several attempts - which could convert the nurse's mistaken or negligent description of his dietary needs in internal medical records into outrageous conduct causing him severe emotional distress. In the accompanying Order, we grant the nurse's motion to dismiss all claims against her.

## I.   Alleged facts

Raymond Davenport, a devout Jewish man, claims he experienced "disorientation of thoughts and confusion" on or about April 3, 2015.[1] Over the next six days, he claims he became "increasingly sensitive to humanitarian issues in the world and maintained a positive and

peaceful demeanor."[2] He sought medical attention on April 9, 2015 and a physician deemed him "not a harm to himself or others."[3] Mr. Davenport went to a local grocery store on April 10, 2015 to purchase food for Shabbat and while shopping, "continued to become increasingly confused and did not properly use the self-checkout machine in the store."[4] He then left the store and attempted to find his car in the parking lot, but a store employee asked him to return to the store.[5]

The store called the North Coventry Township Police on suspicions of theft because of Mr. Davenport's "incorrect checkout procedure and subsequent walk out to the parking lot."[6] Mr. Davenport attempted to pay for the groceries and the police found he had no intent of theft due to his confusion and cooperation.[7] The store did not pursue theft charges against Mr. Davenport.[8]

The police placed Mr. Davenport into custody at 12:30 p.m., handcuffed, and searched him.[9] The officers then drove him to the police station.[10] He does not indicate the reason the police placed Mr. Davenport in custody. When they arrived at the police station, the officers placed him in a holding area with handcuffs and requested Ebony Willis from Value Creek Crisis to evaluate Mr. Davenport's mental state.[11] After Ms. Willis completed the evaluation, the officers told Mr. Davenport to sign a "201 for voluntary treatment or be faced with criminal charges and incarceration" and his "life would be more difficult" if he refused to sign the "201."[12] Mr. Davenport signed the "201" and Officer Victoria Hipple drove him to Pottstown Memorial for drug and alcohol screening and medical clearance.[13] During his time at the police station, Detective Timothy Prouty spoke with Mr. Davenport's mother "regarding his religious beliefs, his time living in Israel, and his time spent on a Kibbutz."[14] His mother "confirmed this information as accurate and not a delusion," but this conversation is not included in the police

report Mr. Davenport received.[15] He alleges the officers "questioned and coerced statements from [him] in an interrogation style which caused undue stress on [him]" by "threatening to hold [him] at the Police Station without being allowed medical treatment if he did not confess to a subset of possible explanations for his behavior" such as "confessed to using drugs."[16]

Upon arrival at Pottstown Memorial, Officer Hipple handed the signed 201 paperwork to Lauren, a crisis worker.[17] Mr. Davenport does not know what additional information Officer Hipple provided to Pottstown Memorial or Lauren.[18] Mr. Davenport "signed himself in to [Pottstown Memorial] with disoriented thoughts, confusion, and reduced physical awareness under threats of incarceration and criminal prosecution if he did not sign himself in at" the hospital.[19] Pottstown Memorial employees assessed him as "confused and disoriented, but not a harm to himself or others."[20] Mr. Davenport mentioned he maintained a kosher diet for Passover, hospital employees noted his dietary restrictions, but interpreted him to be on a "fasting strike."[21] The employees described his reference to Passover as "rambl[ing] a little bit about Passover" in his medical records.[22] Mr. Davenport alleges Nancy Coyne, a registered nurse at the Hospital, is responsible for describing Mr. Davenport's dietary restrictions as a "fasting strike" in the medical records.[23]

Mr. Davenport alleges upon his admission, Pottstown Memorial erroneously combined his medical records with the records of a patient suffering from a history of self-mutilation, suicide attempts, and suicidal statements.[24] Pottstown Memorial brought Mr. Davenport to a room without furniture and left him unsupervised for over an hour in the emergency room area.[25] He became even more confused and disoriented during this time because "the stress of seeing and hearing other trauma and the lack of supervision for this time negatively affected [him] and his condition."[26] Later in the evening, Mr. Davenport "fell to the floor and became unresponsive

3

and unconscious for an extended period of time" and "[a]s a result of the fall, his condition immediately and significantly worsened which caused a significant change in mental state/behavior, extreme long-term pain and suffering, and extended treatments at other facilities among other damages."[27] Individuals unknown to Mr. Davenport attempted to revive him.[28] An employee of Pottstown Memorial, Jose Ortiz, called the North Coventry Police Department because Ms. Willis signed the 201 form in the incorrect location and Officer Jesse Smith allegedly "discussed circumstances with [Mr.] Ortiz and advised [Mr.] Ortiz that if [Mr.] Davenport] would not sign another 201 form, that Officer Smith would incarcerate [him] and complete a criminal complaint."[29]

Officer Smith arrived at Pottstown Memorial at 11:00 p.m. on Friday, April 10, 2015.[30] A witness allegedly heard Officer Smith say "he was frustrated and that 'this guy is on drugs' and 'should be locked up.'"[31] Officer Smith went to Mr. Davenport's room "during a forced and short moment of consciousness in which [he] awakened in pain and continued disorientation" and Mr. Davenport "asked for someone to close [the] door to [the] room to reduce [the] stressful environment."[32] When no one responded to his requests, Mr. Davenport attempted to walk to the door and close it and Officer Smith allegedly "grabbed [him] by the arm then proceeded to do a 'left arm bar' driving [him] into the wall and handcuffed [him] behind his back."[33] Hospital security responded and helped restrain Mr. Davenport to the hospital bed with handcuffs and cuff restraints.[34] A witness allegedly saw Officer Smith grab Mr. Davenport by the throat area and pin him against the wall of the room elevating him off the floor "fearful for his life."[35] While pinning Mr. Davenport against the wall, Officer Smith asked him two questions "regarding harm to self or others" to which Mr. Davenport responded "'no' and 'no.'"[36] Officer Smith "then rephrase[d] the first question and ask[ed] if [Mr. Davenport] is suicidal at which point Officer

4

Smith claims [he] replied 'yes.'"[37] Mr. Davenport claims "[t]his alleged 'yes' is in response to the significant trauma, stress, assault, and battery experienced over the past few hours" and "was used to fill out a 302 commitment which resulted in an involuntary commitment based on Officer Smith's account without any prior supporting evaluation."[38]

## II. Analysis

Nurse Coyne moves to dismiss the two claims against her based on her recording, possibly mistakenly, Mr. Davenport dietary concerns in internal medical records. We grant Nurse Coyne's motion in the accompanying Order.[39]

### A. We dismiss Mr. Davenport's § 1983 claim against Nurse Coyne.

Mr. Davenport alleges Nurse Coyne violated his religious liberty rights because she "is responsible for some of the medical record entries which claim [he] was on fasting strike for holding to his sincerely held religious beliefs regarding kosher for Passover dietary restrictions."[40] Mr. Davenport claims Nurse Coyne's inaccurate entries in his medical record coupled with the actions of co-defendants Officer Jesse Smith, Victoria Hipple, North Coventry Township, Jose Ortiz, Dr. Pamela Franz, and the six unnamed individuals "were committed under color of state law, either directly or through conspiracy whereby Defendants, conspired to deprive [him] of his civil right freedom of religion under the [F]irst [A]mendment."[41]

Mr. Davenport must allege facts showing "(1) [...] the conduct complained of was committed by a person acting under color of state law; and (2) [...] the conduct deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States."[42] For Nurse Coyne to be held liable under the United States Constitution, her misconduct must involve "state action."[43] Mr. Davenport must plead Nurse Coyne committed the alleged misconduct "under color of state law."[44] We must consider the "principle question"

5

of whether there is a "close nexus" between the state and Nurse Coyne's conduct to conclude her "private behavior may be fairly treated as that of the State itself."[45]

Our court of appeals provides three tests to determine if state action is present: "(1) whether the private entity has exercised powers that are traditionally the exclusive prerogative of the state; (2) whether the private party has acted with the help of or in concert with state officials; and (3) whether the state has so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity."[46] For each test, "the injury is fact-specific."[47]

A decision of "private parties according to professional standards that are not established by the state" does not equate to state action.[48] Our Supreme Court held in *Polk County v. Dodson* a public defender does not act "under color of state law" when his decisions "in the course of representing his client were framed in accordance with professional canons of ethics, rather than dictated by any rule of conduct imposed by the State" even though the state employed the defender and appointed him to represent a defendant.[49] The Court concluded the defender's "assignment entailed functions and obligations in no way dependent on state authority."[50]

"A private actor and a public actor working in concert can form a civil conspiracy to violate an individual's civil rights under section 1983."[51] Mr. Davenport must plead "with particularity the 'circumstance' of the alleged wrong doing in order to place the defendants on notice of the precise misconduct with which they are charged" to plead a § 1983 conspiracy claim.[52] He must allege facts addressing: "(1) the period of the conspiracy, (2) the object of the conspiracy, and (3) certain actions of the alleged conspirators taken to achieve that purpose."[53] The acts of a private entity can be attributed to the state when the actor utilizes the aid of state officials when taking advantage of state procedures.[54] In *Lugar v. Edmondson Oil Co.*, our

6

Supreme Court held "a private party's joint participation with state officials in the seizure of disputed property is sufficient to characterize that party as a 'state actor' for purposes of the Fourteenth Amendment."[55]

A plaintiff must allege specific facts linking the private party's actions to the conspiracy when claiming a § 1983 violation.[56] In *Labolokie v. Capital Area Intermediate Unit*, the plaintiff claimed a corporate entity and two of its agents engaged in a conspiracy in violation of § 1983 after the defendants barred his ability to contract with the company.[57] The court concluded the plaintiff failed to state a claim against one of the agents because he did not allege "specific conduct whatsoever connecting" the agent with the conspiracy.[58] The plaintiff claimed his "termination" occurred with the agent's "'agreement' and 'support'" and the agent "since 'continued, up-held, ratified, and approved the wrongful acts,'" which the court found to be insufficient "conclusory allegations" without an "underlying factual scenario involving [the agent] about which the conclusions could be said to be true or false."[59]

Mr. Davenport fails to allege facts Nurse Coyne acted "under color of state law" or conspired with state officials to deprive him of his rights when she described his Passover dietary restrictions as a "fasting strike" in the medical records. Mr. Davenport has not established the requisite "close nexus" between the state and Nurse Coyne's conduct. As in *Polk County*, where the court found a public defender's decisions based on "professional canons of ethics" for attorneys did not constitute state action,[60] Mr. Davenport failed to establish Nurse Coyne's documentation in the medical records exceeded her duties and professional capacity as a nurse.

Mr. Davenport also fails to plead Nurse Coyne conspired with state officials to deprive Mr. Davenport of his rights. As in *Labolokie v. Capital Area Intermediate Unit*, where the plaintiff failed to allege specific conduct connecting the plaintiff with the conspiracy,[61] Mr.

7

Davenport does not plead a specific action Nurse Coyne engaged in with state officials for the purpose of depriving him of his rights. Mr. Davenport does not allege facts showing Nurse Coyne violated § 1983 by her inaccurate documentation in his medical records or she conspired with state officials to deprive him of his religious liberty rights. We dismiss his § 1983 claim against Nurse Coyne.

### B. Mr. Davenport fails to plead Nurse Coyne acted with outrageous conduct to support an intentional infliction of emotional distress claim.

Mr. Davenport alleges Nurse Coyne intentionally inflicted emotional distress upon him. He must plead Nurse Coyne (1) engaged in intentional or reckless conduct; (2) to an extreme and outrageous level; (3) which actually caused the distress; and (4) the distress is severe, to plead an intentional infliction of emotional distress claim under Pennsylvania law.[62] "In Pennsylvania, '[l]iability on an intentional infliction of emotional distress claim has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'"[63] Mr. Davenport must plead facts demonstrating outrageous conduct by Nurse Coyne.[64] "The level of outrageousness required to support a claim for intentional infliction of emotional harm is comparable to, if not higher than, that required to support an award of punitive damages."[65]

Mr. Davenport must allege he suffered "severe" emotional distress resulting from Nurse Coyne's conduct to maintain his claim for intentional infliction of emotional distress.[66] "Fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry and nausea" all indicate "severe" emotional distress.[67] The court in *Lane v. Cole* found the plaintiff's allegations she "continue[d] to suffer 'fear, anxiety, stress, anger, headaches, nightmares, humiliation, embarrassment, emotional distress [and] mental anguish'" raised an inference of

severe emotional distress.[68] Allegations of physical injury must accompany allegations of emotional distress.[69]

Mr. Davenport fails to state a claim for intentional infliction of emotional distress against Nurse Coyne. Mr. Davenport's allegations regarding Nurse Coyne's conduct are limited to her writing "medical record entries which claim [he] was on fasting strike for holding to his sincerely held religious beliefs regarding kosher for Passover dietary restrictions."[70] At most, Nurse Coyne acted negligently in improperly recording Mr. Davenport's dietary restrictions. Nurse Coyne's routine documentation of medical records, even if recorded negligently, does not constitute conduct rising to "[t]he level of outrageousness [...] required to support an award of punitive damages" as is required to plead an intentional infliction of emotional distress claim.[71]

### III. Conclusion

We previously granted in part and denied in part the Defendants Pottstown Memorial Medical Center, North Coventry Township, Officer Smith, Officer Hipple, Detective Prouty, Nurse Rita Andrews, Dr. Franz, and Mr. Ortiz's motion to dismiss for failure to state a claim. We now grant Nurse Coyne's motion to dismiss Mr. Davenport's § 1983 and intentional infliction of emotional distress claims. Mr. Davenport's allegations regarding Nurse Coyne's conduct is limited to her possibly mistaken documentation of his dietary restrictions as a "fasting strike" in the medical records. Mr. Davenport fails to plead Nurse Coyne acted "under color of state law" when she included the inscription in his medical record. She acted in her professional capacity as a nurse at Pottstown Memorial Hospital when she included Mr. Davenport's dietary restrictions in the medical records. Nurse Coyne's inaccurate documentation on Mr. Davenport's medical records also does not rise to the level of outrageous conduct required to support an intentional infliction of emotional distress claim. We dismiss his claims against Nurse Coyne.

9

---

[1] ECF Doc. No. 37 at ¶ 13, 64.

[2] *Id.* at ¶ 14.

[3] *Id.* at ¶ 15.

[4] *Id.* at ¶ 16.

[5] *Id.*

[6] *Id.* at ¶ 17.

[7] *Id.* ¶ 18.

[8] *Id.*

[9] *Id.* at ¶ 19.

[10] *Id.*

[11] *Id.*

[12] *Id.* at ¶ 20.

[13] *Id.* at ¶¶ 20, 25.

[14] *Id.* at ¶ 21.

[15] *Id.* at ¶ 22.

[16] *Id.* at ¶ 24.

[17] *Id.* at ¶ 26.

[18] *Id.* at ¶ 27.

[19] *Id.* at ¶ 28.

[20] *Id.* at ¶ 29.

[21] *Id.* at ¶¶ 64-66.

[22] *Id.*

[23] *Id.* at ¶ 69.

[^24]: *Id.* at ¶ 31.

[^25]: *Id.* at ¶ 32.

[^26]: *Id.* at ¶ 33.

[^27]: *Id.* at ¶¶ 34-35.

[^28]: *Id.* ¶ 39.

[^29]: *Id.* at ¶ 40.

[^30]: *Id.* at ¶ 43.

[^31]: *Id.*

[^32]: *Id.* at ¶ 44.

[^33]: *Id.*

[^34]: *Id.*

[^35]: *Id.* at ¶ 45.

[^36]: *Id.*

[^37]: *Id.*

[^38]: *Id.* at ¶ 46.

[^39]: In deciding a motion to dismiss under Rule 12(b)(6), we accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party, but we "are not compelled to accept unsupported conclusions and unwarranted inference, or a legal conclusion couched as a factual allegation." *Castleberry v. STI Group*, 863 F.3d 259, 263 (3d Cir. 2017) (quoting *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Edinboro Coll. Park Apartments v. Edinboro Univ. Found.*, 850 F.3d 567, 572 (3d Cir. 2017) (quoting *In re Vehicle Carrier Serv. Antitrust Litig.*, 846 F.3d 71, 79 n.4 (3d Cir. 2017)). A claim satisfies the plausibility standard when the facts alleged "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Maiden Creek Assoc., L.P. v. U.S. Dep't of Transp.*, 823 F.3d 184, 189 (3d Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). While the plausibility standard is not "akin to a 'probability requirement,'" there nevertheless must be more than a "sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550

U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). Our Court of Appeals requires we apply a three-step analysis under a 12(b)(6) motion: (1) "it must 'tak[e] note of the elements [the] plaintiff must plead to state a claim;'" (2) "it should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth;'" and, (3) "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 675, 679).

[40] ECF Doc. No. 37 at ¶ 69.

[41] *Id.* at ¶ 76.

[42] *Schneyder v. Smith*, 653 F.3d 313, 319 (3d Cir. 2011).

[43] *Sprauve v. West Indian Co. Ltd.*, 799 F.3d 226, 229 (3d Cir. 2015)(quoting *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 937 (1982)).

[44] *Id.* at 229 (quoting *Groman v. Twp. of Manalapan*, 47 F.3d 628, 638 (3d Cir. 1995)).

[45] *Kach v. Hose*, 589 F.3d at 646 (quoting *Leshko v. Servis*, 423 F.3d 337, 339 (3d Cir. 2005)).

[46] *Id.*)(quoting *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1142 (3d Cir. 1995)).

[47] *Id.* (quoting *Groman*, 47 F.3d at 638 (brackets omitted)).

[48] *Blum v. Yaretsky*, 457 U.S. 991, 1008 (1982).

[49] *Id.* at 1009 (citing *Polk County v. Dodson*, 454 U.S. 312 (1981)).

[50] *Polk*, 454 U.S. at 318.

[51] *Hennessy v. Santiago*, 708 A.2d 1269, 1277 (Pa. Super. 1998)(citing *Adickes v. Kress & Co.*, 398 U.S. 144, 150-52 (1970)).

[52] *Labalokie v. Capital Area Intermediate Unit*, 926 F. Supp. 503, 508-09 (M.D.Pa. 1996)(quoting *Rose v. Bartle*, 871 F.2d 331, 366 (3d Cir. 1989)).

[53] *Id.* (quoting *Rose v. Bartle*, 871 F.2d 331, 366 (3d Cir. 1989)).

[54] *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 942 (1982).

[55] *Id.* at 941.

[56] *Labalokie*, 926 F. Supp. at 508-09.

[57] *Id.*

[58] *Id.*

[59] *Id.* at 509.

[60] *Blum*, 457 U.S. at 1009 (1982)(citing *Polk*, 454 U.S. 312).

[61] *Labalokie*, 926 F. Supp. at 509.

[62] *Regan v. Township of Lower Merion*, 36 F.Supp.2d 245, 251 (E.D.Pa. 1999).

[63] *Kasper v. Cnty. of Bucks*, 514 Fed.Appx. 210, 217 (3d Cir. 2013)(internal citations and quotations omitted).

[64] *See Kazatsky v. King David Memorial Park, Inc.*, 527 A.2d 988, 991 (1987)(intentional infliction of emotional distress requires outrageous conduct on the part of the tortfeasor).

[65] *Wisniewski v. Johns Manville Corp.*, 812 F.2d 81, 86 n.3 (3d Cir. 1987).

[66] *Lane v. Cole*, 88 F.Supp.2d 402, 407 (E.D.Pa. 2000).

[67] *Id.* (quoting *Kazatsky*, 527 A.2d at 991 (quoting Restatement (Second) of Torts § 46 cmt. D)).

[68] *Id.*

[69] *Lane*, 88 F.Supp.2d at 407; *See also Corbett v. Morgenstern*, 934 F.Supp. 680, 684-85 (E.D.Pa. 1996)(symptoms of severe depression, anxiety, nightmares, and ongoing mental or physical harm are sufficient in pleading intentional infliction of emotional distress).

[70] ECF Doc. No. 37 at ¶ 69.

[71] *Wisniewski*, 812 F.2d at 86 n.3.